UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ISOVOLTA INC., | ) | |
|     *Plaintiff*, | ) | |
| | ) | |
|     *vs*. | ) | 1:08-cv-1319-JMS-DML |
| | ) | |
| PROTRANS INT'L, INC., *et al.*, | ) | |
|     *Defendants.* | ) | |

## ORDER GRANTING TYCO'S MOTION FOR SUMMARY JUDGMENT

Presently before the Court is Defendant Tyco Fire Products, LP's ("Tyco") Motion for Summary Judgment. [Dkt. 164.] Tyco moves for summary judgment on all of Plaintiff Isovolta Inc.'s ("Isovolta") claims against it. For the following reasons, the Court enters summary judgment in favor of Tyco.

### STANDARD

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor. *See* Fed. R. Civ. Pro. 56. When evaluating a motion for summary judgment, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial . . . against the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). Nevertheless, "the Court's favor toward the non-moving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). The non-moving party must set forth specific facts showing that there is a material issue for trial. Fed. R. Civ. Pro. 56(e); *Celotex*, 477 U.S. at 323. The key inquiry is the existence of evidence to support a plaintiff's claims or a defendant's affirmative defenses, not the

weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999).

Courts often call summary judgment, the "put up or shut up" moment in litigation, meaning that the non-moving party is required to present the Court with the evidence it contends will prove its case. *Goodman v. NSA, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). And by evidence, the Court means evidence on which a reasonable jury could rely. *Id.*

**FACTUAL BACKGROUND**

The following facts are undisputed. In March 2008, a sprinkler head activated in the absence of fire in a warehouse in Laredo, Texas, damaging Isovolta's goods. Tyco manufactured the sprinkler head at issue—an ESFR-17 with a 165-degree temperature rating.[1] There is a risk that the 165-degree version of the ESFR-17 will activate without a fire when installed in an environment where the temperature exceeds 100 degrees. Therefore, 165-degree ESFR-17 sprinkler heads should not be installed in warehouses where interior temperatures exceed 100 degrees. Tyco warns installers of this risk by packaging each sprinkler head in a box that contains a technical data sheet and installer warning, cautioning the installer about the temperature restrictions for the sprinkler head.

Former Defendant Firecheck of Texas, Inc. ("Firecheck") installed the 165-degree version of ESFR-17 in the warehouse leased by Defendant ProTrans International, Inc. ("ProTrans") where ProTrans was storing Isovolta's goods. The warehouse is not air-conditioned. Pursuant to Tyco's packaging, Firecheck should have installed a 212-degree version of the ESFR-17 in the warehouse.

---

[1] All temperatures are in Fahrenheit.

In the weeks following the incident that damaged Isovolta's goods, two other sprinkler heads discharged in the absence of fire in the warehouse. The 165-degree ESFR-17 sprinkler heads were replaced with 212-degree sprinkler heads, and there have been no premature sprinkler activations since that time.

Isovolta's operative complaint alleges claims against various parties stemming from the March 2008 sprinkler activation. [Dkt. 85.] Specifically, Isovolta alleges a breach of contract claim against ProTrans; product liability and negligence claims against Tyco; and a negligence claim against Firecheck. Firecheck settled with Isovolta and was dismissed by stipulation from this action. [Dkt. 171.]

## DISCUSSION

### I. Products Liability Claim

Isovolta alleges that Tyco placed a defective sprinkler head into the stream of commerce that caused the damage to Isovolta's goods. [Dkt. 85 at 4.] Tyco argues that Isovolta has not identified a defect with its product and has not eliminated other potential causes.

#### A. Texas Products Liability Law

The parties agree that Texas law applies. Texas has adopted strict liability for the sale of dangerously defective products. *Parsons v. Ford Motor Co.*, 85 S.W.3d 323, 329 (Tex. Ct. App. 2002). To prove a products liability claim, the plaintiff must prove (1) a product defect, (2) that existed at the time the product left the manufacturer's hands, (3) the defect made the product unreasonably dangerous, and (4) the defect was a producing cause of the plaintiff's injuries. *Haddock v. Mentor Tex. L.P.*, 2005 U.S. Dist. LEXIS 4975, *7 (N.D. Tex. 2005).

A product's failure or malfunction, standing alone, is generally not proof of a defect. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 42 (Tex. 2007). Instead, "a specific defect must be identified by competent evidence and other possible causes must be ruled out." *Id.*; *Nissan Mo-*

*tor Co. v. Armstrong*, 145 S.W.3d 131 at 137 (Tex. 2004). The plaintiff must establish that the product was defective when it left the manufacturer and that the defect was a "producing cause of plaintiff's injuries." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). Although the plaintiff may establish a material fact regarding the defect through direct or circumstantial evidence, "the evidence must transcend mere suspicion. Evidence that is so slight as to make any inference a guess is in legal effect no evidence." *Id.* at 601. Expert testimony is encouraged, but not required, to prove a products liability claim. *Purcel v. Advanced Bionics Corp.*, 2010 U.S. Dist. LEXIS 67109, *30 (N.D. Tex. 2010).

### B. Isovolta's Position Regarding a Defect

Isovolta did not identify a specific defect with Tyco's sprinkler head in its Second Amended Complaint, simply alleging that Tyco placed a defective sprinkler in the stream of commerce that caused damage to Isovolta's goods. [Dkt. 85 at 4.] In response to a discovery request asking Isovolta to "describe in detail the nature of the defect," Isovolta directed Tyco to its Second Amended Complaint and answered that "[d]iscovery is continuing." [Dkt. 166 at 68.] Isovolta never supplemented this discovery response.

In August 2010, Isovolta disclosed a liability expert and submitted his expert report. Isovolta's expert does not offer an opinion regarding the cause of the sprinkler head activation, instead concluding that independent testing on the 2,000 sprinklers in the warehouse "may provide the information necessary to establish some conclusions as to whether the Tyco sprinklers originally installed were damaged, defective, or possessed a temperature rating that was too low for the ambient conditions." [Dkt. 166 at 33.] Isovolta has submitted no evidence that the independent testing recommended by its expert ever occurred.

Isovolta's expert proffers five conclusions that could result from independent testing: (1) the sprinkler head may have been damaged, (2) it may have exhibited evidence of link failure or weakening due to repeated exposure to temperatures greater than 100 degrees, (3) it may have been subjected to over-pressurization, (4) it may have been subjected to corrosion, link torsion, or elevated temperatures, or (5) it may have been defectively manufactured. [Dkt. 166 at 33.] Isovolta's expert also found it "significant that there have been no sprinkler discharges since the replacement of the 165°F Tyco K-17 ESFR sprinklers with 212°F Victaulic ESFR sprinklers was performed." [Dkt. 166 at 33.]

### C. Failure to Rule Out Other Possible Causes

Isovolta emphasizes throughout its brief that it can prove a defect with Tyco's product by circumstantial evidence. While this may be true as a general matter, Isovolta fails to acknowledge that it still must "rule out other possible causes." *Ledesma*, 242 S.W.3d at 42; *Armstrong*, 145 S.W.3d at 137.

Instead of ruling out other possible causes, Isovolta has actually advocated for them. Isovolta sued Firecheck on the theory that Firecheck's installation of the wrong sprinkler heads caused the premature activation. Specifically, Firecheck installed 165-degree sprinkler heads in the non-air-conditioned warehouse instead of 212-degree sprinkler heads manufactured to withstand higher temperatures. Although Firecheck settled with Isovolta, Isovolta continues to blame Firecheck's erroneous installation in its claims against ProTrans. Isovolta asserts that ProTrans was responsible for the erroneous installation because the non-compliant warehouse allegedly breached Isovolta's bailment contract with ProTrans. [*See, e.g.*, dkts. 181 at 13 ("The 'ordinary' ESFR 17 165° heads which were installed in ProTrans' warehouse were insufficient, noncompliant with the [applicable codes] and prone to fail in a non-air-conditioned, high-ceiling ware-

house in a climate that is even occasionally hot.").] Isovolta also argues that ProTrans caused the damage to its goods. [Dkt. 201 at 8 ("The record is replete with evidence that ProTrans was a but-for cause of the water damage to Isovolta's goods.").]

Isovolta's failure to rule out other possible causes of the sprinkler activation defeats its products liability claim against Tyco. Isovolta's own expert supports this conclusion by proffering five possible causes of the premature sprinkler activation and concluding that independent testing of the 2,000 sprinklers from the warehouse "may provide the information necessary to establish some conclusions." [Dkt. 166 at 33.] There is no evidence that this testing ever occurred. Therefore, according to Isovolta's own expert, there are at least four possible causes of the sprinkler activation that do not involve a defect with Tyco's product.[2]

Isovolta can't have it both ways. Instead of ruling out other possible causes, Isovolta advocates for them in its other claims. This defeats Isovolta's products liability claim against Tyco.

### D. Failure to Present Evidence of Product Defect

Additionally, Isovolta offers insufficient evidence to create an issue of material fact that the sprinkler head at issue was defective. The only evidence Isovolta cites is from a portion of Tyco's hang test records from 2006. [Dkt. 179-8.] This evidence, viewed in a light most favorable to non-movant Isovolta, establishes that some batches of Tyco's sprinkler heads failed an

---

[2] Isovolta attempts to use Tyco's expert's opinion that the sprinkler head activated because environmental heat weakened the solder link as proof that Tyco caused Isovolta's damages. Contrary to Isovolta's assertion, however, Tyco's expert opinion is not an admission that Tyco was "a cause-in-fact of the sprinkler activation," [dkt. 178 at 11], because the sprinkler head was installed in the non-air-conditioned warehouse by Firecheck, not Tyco. In other words, if the sprinkler activated because of the high temperature in the warehouse, it functioned as intended and is not proof of a defect. Isovolta's argument could have merit if Tyco had a duty of care to confirm that its product was not installed in a non-compliant matter; however, the Court has already rejected Isovolta's motion advocating the imposition of that legally-unsupported duty. [Dkt. 205.]

initial hang test but passed a second hang test and were ultimately put into the stream of commerce. Significantly, there is no evidence that the sprinkler head at issue came from one of the identified batches of sprinklers that failed the initial hang test. There is also no evidence regarding the number of sprinkler heads manufactured during the relevant time period or the percentage of sprinkler heads that failed an initial hang test but passed a second hang test.

Without this information, the Court (or the jury) is left to impermissibly guess whether the sprinkler head at issue came from one of the batches of sprinkler heads that failed an initial hang test. This is insufficient to create an issue of material fact on summary judgment. *See Ridgway*, 135 S.W.3d at 601 (reversing intermediate appellate court and granting summary judgment to manufacturer because "[e]vidence that is so slight as to make any inference a guess is in legal effect no evidence"). In fact, the case Isovolta relies on to support its position actually supports the Court's conclusion. [Dkt. 178 at 4-5 (relying on *Shaun T. Mian Corp. v. Hewlett-Packard Co.*, 237 S.W.3d 851 (Tex. Ct. App. 2007)).] *Shaun T.* concluded, in relevant part, that although it is possible to avoid summary judgment on a product liability claim through circumstantial evidence, the non-movant must show that "more than a scintilla of probative evidence exists" regarding the elements of the claim and that "[s]uch evidence must do more than create a mere surmise or suspicion." *Id.* at 862. Specifically, "if the evidence is such as to render any inference of these elements no more than a guess, it is insufficient." *Id.*

The speculative evidence that Isovolta proffers does no more than create suspicion and leaves the Court (or a jury) to impermissibly guess as to whether Tyco's product had a defect that caused Isovolta's damage. For this reason, and because Isovolta has failed to rule out other possible causes of the sprinkler's premature activation, the Court grants summary judgment in favor of Tyco on Isovolta's products liability claim.

## II. Negligence Claim

Isovolta also asserts a claim for negligence against Tyco. The legal principles governing a negligence claim are distinct, even if the negligence claim is factually identical to a products liability claim. *See McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403, 431 (5th Cir. 2001) ("Under Texas law, strict liability and negligence, although sharing similar and common elements, are two entirely separate theories of recovery in a products liability action."). A negligence claim focuses upon the conduct of the manufacturer in placing the product into the stream of commerce and requires a determination of whether that conduct complies with the applicable standard of care. *Id.* To prove a negligence claim in this context, the plaintiff must demonstrate (1) that the manufacturer owed a duty to the plaintiff, (2) that the manufacturer breached that duty, (3) that the plaintiff was injured, and (4) that the manufacturer's breach of the duty was the proximate cause of the plaintiff's injury or damages. *Id.*

Isovolta focuses its negligence claim on perceived inadequacies in Tyco's manufacturing process. In its Second Amended Complaint, Isovolta asserts that Tyco breached its duty of care to Isovolta by "(a) failing to use due care in the design, manufacture, assembly, sale and supply of the sprinklers and (b) failing to use due care to test and inspect the sprinklers to determine whether they were durable and functional for their intended purpose." [Dkt. 85 at 4 ¶ 27.] In response to Tyco's summary judgment motion, Isovolta relies on its expert's cursory assertion that Tyco "employed an insufficient procedure to detect defectively manufactured link elements that could rupture and cause the malfunction of the Tyco sprinkler in the ProTrans Laredo warehouse." [Dkt. 166 at 63.]

The Court has already rejected Isovolta's proposal that Tyco has a duty of care to keep 165-degree ESFR-17 sprinkler heads out of the Texas market so that they do not end up being

"illegally installed." [Dkt. 205 at 4-5, 7.] Specifically, the Court found that the economic consequence of requiring Tyco to monitor the ultimate destination and installation of its products is untenable, especially where, as here, a professional installer chose and installed the product. [Dkt. 205 at 6.] Moreover, Tyco's product comes with a warning—the adequacy of which Isovolta does not challenge—that cautions installers about the temperature restrictions of the sprinkler head. [*Id.*] Therefore, to the extent Isovolta argues that Tyco had a duty regarding the sale, supply, and ultimate placement of its product, the Court has already rejected that legally-unsupported proposed duty. [Dkt. 205.]

As detailed above, Isovolta has not presented any probative evidence that the sprinkler head at issue was defective. *See supra* Part I.D. To prove that Tyco's manufacturing process was negligent, Isovolta still must show that the sprinkler head at issue was defective and was the proximate cause of Isovolta's damages. In other words, unless the sprinkler head at issue was defective, Isovolta cannot prove that Tyco breached any duty regarding the manufacture of the sprinkler. Likewise, if the sprinkler head at issue was not defective, it could not be the proximate cause of the damage to Isovolta's goods.

Isovolta's expert points to at least four possible causes of the sprinkler activation that do not involve a defect with Tyco's product—the sprinkler head may have been damaged, it may have failed due to repeated exposure to temperatures over 100 degrees, it may have been over-pressurized, or it may have been subject to corrosion or link torsion. [Dkt. 166 at 33.] Because there is no evidence that the independent testing Isovolta's expert proposed ever happened, Isovolta's expert confirms that there are multiple possibilities regarding the cause of the premature sprinkler activation. Four of these possibilities have nothing to do with a product defect.

Although Isovolta critiques Tyco's testing procedure, there is absolutely no evidence that the sprinkler head at issue came from one of the batches that failed an initial hang test, passed a second hang test, and was put into the stream of commerce. Summary judgment is the "put up or shut up" moment in litigation. *Goodman*, 621 F.3d at 654. Therefore, Isovolta is required to present the Court with evidence on which a reasonable jury could rely to prove its claim. *Id.* Although Isovolta argues throughout its brief that a jury could infer from its speculation that Tyco's sprinkler head was defective, based on the record before this Court, any inference would be an impermissible guess. Because Isovolta has not put forth the probative evidence necessary to send its claims against Tyco to a jury, Tyco is entitled to summary judgment on Isovolta's negligence claim.

## Conclusion

For the foregoing reasons, the Court **GRANTS** Tyco's Motion for Summary Judgment. [Dkt. 164.] Isovolta shall take nothing by way of its Second Amended Complaint on its claims against Tyco.

02/14/2011

*(signature)*

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Scott J. Brown
CASSIDAY SCHADE LLP
sjb@cassiday.com

Braden Kenneth Core
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
bcore@scopelitis.com

Eric K. Habig
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
ehabig@scopelitis.com

Lia M. Hanson
STUART & BRANIGIN LLP
lmh@stuartlaw.com

Katharine Hoyne Hosty
CASSIDAY & SCHADE LLP
khh@cassiday.com

Brent Emerson Inabnit
SOPKO NUSSBAUM INABNIT & KACZMAREK
brenti@sni-law.com

William P. Kealey
STUART & BRANIGIN
wpk@stuartlaw.com

Brandon J. Kroft
CASSIDAY SCHADE LLP
bjk@cassiday.com

John Mathews Stuckey
STUART & BRANIGIN LLP
jms@stuartlaw.com

Emily J. O. Sullivan
SHOOK HARDY & BACON L.L.P.
ejsullivan@shb.com

R. Kent Warren
SHOOK HARDY & BACON LLP
rwarren@shb.com

Stanley Yorsz
BUCHANAN INGERSOLL & ROONEY PC
stanley.yorsz@bipc.com